UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   PAT N. ARCHULETA,                                      No. 19-12905-j7

Debtor.

**MEMORANDUM OPINION ON OBJECTION TO CLAIM #8**

THIS MATTER is before the Court on the Trustee and Debtor's Joint Objection to

Claims No. 6 and 8 by Angela Valencia ("Objection to Claim"–Doc. 41).[1] The Court held a final,

evidentiary hearing on the Objection to Claim on January 25, 2021, January 29, 2021, and

February 17, 2021, and took the matter under advisement. Having considered the evidence in

light of counsel's arguments, the applicable Bankruptcy Code sections, and relevant caselaw, the

Court finds and concludes that claimant Angela Valencia has sustained her ultimate burden of

proving part but not all of the amount of her claim. The Court will, therefore, sustain the

Objection to Claim, in part, and allow Ms. Valencia's claim in the reduced amount of $6,625.39.

FACTS

Ms. Valencia and Debtor lived together as girlfriend and boyfriend, and later, as an

engaged couple, for approximately eight years. They lived together in Ms. Valencia's home for

approximately six years and in Debtor's home for another two years. Neither charged the other

rent for the time spent living in the other's home. Debtor treated Ms. Valencia's children as

though they were his own. The couple had a joint bank account[2] and managed their finances

similar to how a married couple might manage their finances. They shared living expenses. Ms.

Valencia sometimes paid for expenses attributable to Debtor's construction business, and he

---

[1] The Objection to Claim asserts, in part, that Claim No. 8 is duplicative of Claim No. 6. Creditor Angela
Valencia withdrew Claim No. 6 on October 8, 2020. Doc. 48.
[2] *See* Exhibits A, B, and C.

would pay her back. Ms. Valencia had control over the couple's joint bank account. On occasion, Ms. Valencia would move funds from the couple's joint account to her own.[3]

After eight years together, the couple's relationship deteriorated. Ms. Valencia moved out of Debtor's home on April 1, 2018. After that time, Debtor and Ms. Valencia had some contact, but they lived in separate homes. Ultimately, they did not renew their relationship. They are now estranged.

Debtor worked in construction and, for a period of time, as an electrician, in Milan, New Mexico. He also did various construction jobs for private customers around town. Debtor also worked as a home health aide. Currently, Debtor no longer works. Instead, he takes care of his elderly parents full-time.

Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on December 20, 2019. Ms. Valencia filed proof of claim No. 6 on July 6, 2020, asserting an unsecured claim in the amount of $32,297.92 for "money owed." Ms. Valencia filed proof of claim No. 8 on July 8, 2020, asserting an unsecured claim in the amount of $32,327.92. The Debtor and the Chapter 7 Trustee filed a joint objection to Claimant's Claim No. 6 and Claim No. 8 on September 10, 2020. Claimant withdrew Claim No. 6 on October 8, 2020. Doc. 48.

---

[3] Bank statements show deposits attributable to Debtor's employment income and corresponding transfers to Ms. Valencia's account. *See, e.g.* Exhibit A, deposit from Allegiance Premi on January 1 in the amount of $1,488 and a mobile banking transfer on the same date of $1,488 to Ms. Valencia's account ending in 9056. The statements also show transfers from Ms. Valencia's bank account to the couple's joint account. *See, e.g.,* Exhibit A, mobile banking transfer of $1,956 on February 1 from Account 9056. A bank statement from 2015 reflects that Ms. Valencia transferred $7800 from the couple's joint account to her separate bank account. *See* Exhibit C. Debtor testified that Ms. Valencia used that money to pay her credit card bills.

Ms. Valencia's proof of claim No. 8 (the "Proof of Claim") includes the following

summary of the claimed amounts:

| Description | Amount Claimed |
|---|---|
| Purchase at Discount Tire of $1,699 paid down to $826.75 | $826.75 |
| Purchases at Home Depot | $10,995.05 |
| Purchases at Arnold's Carpet | $3,111.79[4] |
| Purchase at Crego for Fencing | $1,325.00 |
| Car Rental | $404.14 |
| Purchase at Helzberg | $2,496.24 |
| Flooring purchase less $1,200 for flooring material sold | $6,608.84 |
| Wall material purchased for Debtor's home | $363.00 |
| Loans for personal bills | $938.47 |
| $7,500 loan used in settlement of lawsuit, less amounts Debtor paid | $5,798.64 |
| **TOTAL:** | **$32,327.92** |

*The Notarized Statement*

In March of 2018, near the time of the couple's break-up, Ms. Valencia typed a document

("Statement") for Debtor's signature which provided:

> I, Pat N. Archuleta am responsible for the debt of the following in Angela
> Valencia's name. I agree to continue making payments on or before payments are
> due to avoid any judgments against me and/or Angela Valencia's credit. If I do
> not pay these on time or fail to make payment I agree to pay all court/attorney
> costs if this may happen.

*See* Exhibit 1.

The Statement identifies the following debts, without listing any amounts:

> Discount Tire
> Helzberg
> Home Depot
> Sheffield Financial (Trailer)[5]

---

[4] At trial, no evidence of this expense was offered or admitted. The Arnold's Carpet invoices (Exhibits 12
and 12.1) correspond to the flooring purchase itemized in the chart below the Helzberg purchase. At
closing argument, Ms. Valencia's counsel explained that the additional Arnold's Carpet debt itemized in
the Proof of Claim is part of Ms. Valencia's claim for the flooring installed in Debtor's home.
[5] The debt to Sheffield Financial (Trailer) is not part of Ms. Valencia's Claim No. 8.

*Id.* The Statement reflects Debtor's signature and a notarization of Debtor's signature. Debtor denies that he signed the Statement and claims his signature was forged. The notary, Frieda Castillo, testified that Debtor came into her office at H & R Block and signed the Statement. She notarized his signature and made note of it in her notary log. Ms. Castillo's testimony regarding her entry in her notary log was not particularly credible. The entry for the notarization of Debtor's signature does not fall chronologically with other entries in the notary log. Even so, the Court finds that Debtor signed the Statement. The Statement shows that Debtor acknowledged he owes Ms. Valencia for debts incurred at Discount Tire, Helzberg, and Home Depot. However, the Statement does not establish the amount of any debt.

*The Discount Tire Purchase*

Testimony regarding the Discount Tire debt was conflicting. Ms. Valencia claims that Debtor used her credit card to purchase wheels and tires for a trailer that Debtor used in his work. She testified further that she did not authorize Debtor to use her credit card for that purpose. Debtor testified to the contrary that Ms. Valencia authorized him to use her credit card to purchase tires at Discount Tire. Invoices from Discount Tire reflect that in July of 2017, Ms. Valencia purchased tires for the total amount of $1,678.07. *See* Exhibit 10. The invoices bear Debtor's signature on the bottom. *Id.* Debtor made some payments on this debt. Regardless of whether Ms. Valencia authorized Debtor to use her card to purchase tires from Discount Tire, the Court finds that Debtor agreed to pay this debt based on his acknowledgment in the Statement that he owes Ms. Valencia for the debt to Discount Tire coupled with the fact that Debtor paid down a portion of this debt. An invoice attached to the Proof of Claim reflects that Ms. Valencia's outstanding balance with Discount Tire on this debt is $826.75, which is consistent with Ms. Valencia's testimony regarding the amount owed. Debtor did not controvert that Ms.

-4-

Valencia owes such amount on the Discount Tire debt on account of purchases he made and did proffer any evidence to dispute the amount.

*The Home Depot Account*

Ms. Valencia had a credit card account with Home Depot (the "Home Depot Card"). At some point Ms. Valencia added Debtor to her Home Depot Card as an authorized user. Debtor used Ms. Valencia's Home Depot Card to purchase supplies used in his construction and handyman business. Debtor testified that he never used the Home Depot Card after 2018. Ms. Valencia asserts that Debtor continued to use the Home Depot Card after 2018 without her permission and continued to use the Home Depot Card after she removed him as an authorized user.

The account for the Home Depot Card was closed as of June 18, 2019. *See* Exhibit 8.1 An Account Statement reflects a balance of $10,995.05 as of March 24, 2019. *See* Exhibit 8.2. The Account Statement is attached to the Proof of Claim. It does not itemize any charges to the account. Yet, the same Account Statement reflects a balance a month earlier of $00.00 and states the account is past due and that "we did not receive payment for last month." *Id.* No account statements were offered in evidence itemizing any charges to the account. It is impossible to reconcile the receipts and customer order reports reflected in Exhibits 8.3 through 8.77[6] with the closing balance of $10,995.05 on the Home Depot Card as of March 24, 2019. In fact, the account number reflected on the Account Statement does not even match the account number on the receipts. *Compare* Exhibit 8.2 reflecting an Account Number ending in 6680 *with* Exhibit 8.3 reflecting an Account Number ending in 7298.

---

[6] Exhibits 8.31 through 8.44 and Exhibits 8.56–8.78 were excluded from evidence because they covered irrelevant time periods.

Debtor made payments on the Home Depot Card, but there is no evidence to establish how much he paid. A Customer Order Report dated 1/29/19 reflects a payment of $531.41 credited to a Home Depot Card. *See* Exhibits 8.24–8.26.

Ms. Valencia testified that after she closed the Home Depot Card account, Home Depot gave her a credit in the amount of $4,000 due to fraudulent use of the account, leaving a remaining balance of $6,995.05. Yet in her Proof of Claim, Ms. Valencia claimed Debtor owes her $10,995.05 for the debt to Home Depot with no credit for the fraud adjustment. There is no documentary evidence from Home Depot regarding the perpetrator of the fraud, the nature of the fraud, or the amount of the fraud adjustment to the account balance.

The Court does not find Ms. Valencia's testimony sufficiently credible or the other evidence sufficiently persuasive to make any finding regarding the amount Debtor owes Ms. Valencia for his charges to the Home Depot Card.

*Arnold's Carpets*

When Ms. Valencia moved into Debtor's home, they decided to replace the carpet and flooring in his home. Ms. Valencia did not like the existing flooring, even though the flooring was in good condition. The couple was able to re-sell the existing flooring for $1,200.00. Ms. Valencia's family owns Arnold's Carpets. Ms. Valencia purchased flooring from Arnold's Carpets, including laminate flooring for $2,937.79 and carpet for $4,331.05. *See* Exhibit 12 and 12.1. Ms. Valencia claims that Debtor owes her $6,068.84 for the carpet and flooring installed in Debtor's home, which is the balance after applying a $1,200 credit for the sale of the existing flooring. Debtor testified that Ms. Valencia's parents provided the carpet in Debtor's house as a housewarming gift for the couple and did not expect repayment. There is no writing memorializing or reflecting an agreement on the part of Debtor to pay Ms. Valencia for the

-6-

carpet or flooring. The cost of the carpet and flooring, if it was not a housewarming gift, was an expense Ms. Valencia incurred as a couple with no expectation by either to pay the other.

*Fencing*

Ms. Valencia owned two properties across from her separate residence that needed fencing. Ms. Valencia obtained a quote from Crego Metal Roofing for $1,325.00. *See* Claim 8-1, Part 3, p. 4. Ms. Valencia testified that her parents paid Debtor $1,325.00 so that Debtor could install the fencing. *See* Exhibit 12.2–Check from Arnold's Carpets to Pat Archuleta in the amount of $1,325.00. The notation on the bottom of the check says, "fence." The documentary evidence shows that Ms. Valencia's parents' business, Arnold's Carpets, paid Mr. Archuleta for the fence. The fence has not been installed. Debtor testified that he used the $1,325.00 to rent a bobcat and a backhoe to clear the debris from the two properties and level the ground, and that the arrangement was between him and Ms. Valencia's parents. Ms. Valencia countered in her testimony that Debtor agreed to clear the debris and level the property in exchange for payment for fuel for the bobcat and backhoe. She testified further that she repaid her parents $1,325.00, but provided no documentary evidence in support of her testimony. The Court does not find Ms. Valencia's testimony sufficiently credible to make any finding regarding whether she repaid her parents $,325.00, nor is the evidence sufficient for the Court to find that Ms. Valencia's parents expected the $1,325 to be repaid.

*Car Rental*

Sometime in 2018, Debtor and Ms. Valencia attended Debtor's nephew's wedding in Phoenix and rented a car. Each testified the other insisted on renting a larger vehicle. This is the type of expense that the couple incurred together. Both enjoyed the benefit of a larger vehicle.

Ms. Valencia testified that Debtor told her he would reimburse her for the car rental, and that he made one or two payments, but that she eventually paid the balance in full.[7] Debtor testified that he did not agree to reimburse her for the expense. The cost of the rental car was an expense Ms. Valencia and Debtor incurred as a couple with no expectation by either to pay the other.

*The Engagement Ring–Helzberg Diamonds*

When Debtor proposed to Ms. Valencia, the couple picked out an engagement ring. The ring, which cost approximately $6,500, was too expensive to purchase on one credit card, so Debtor and Ms. Valencia charged the cost of the ring one-half to Ms. Valencia's Helzberg credit card and the other half to Debtor's Helzberg credit card. While the couple were together, Debtor made the payments on both credit cards. Later, Ms. Valencia picked out wedding bands to go with the ring. It is unclear from the evidence whether the additional wedding bands were purchased with Debtor's Helzberg credit card or Ms. Valencia's Helzberg credit card. Ms. Valencia testified that Debtor did not pay off the entire debt for the rings. Debtor testified that he paid for the original engagement ring in full.

As of February 27, 2019, Ms. Valencia's account statement from a Capital One Helzberg Diamonds credit card shows a balance due of $2,408.31. *See* Exhibit 11. A Capital One Helzberg Diamonds account statement attached to Ms. Valencia's Proof of Claim reflects a balance of $2,496.24 as of March 29, 2019. *See* Claim 8-1, Part 2, p. 3. It is unclear from the evidence whether this balance was for the original ring or the wedding bands or whether it is the same Helzberg debt listed in the Statement. The evidence is, therefore, inconclusive regarding whether Debtor agreed to pay the balance of Ms. Valencia's Helzberg account.

---

[7] Exhibit 14, an account statement from US Bank dated March 19, 2019 reflecting a balance of $404.14, with Ms. Valencia's handwriting indicating that this charge was for the rental car, was withdrawn.

-8-

Debtor took the rings to Helzberg Diamonds in Albuquerque so the engagement ring and wedding bands could be soldered together. Ms. Valencia denies that she currently has possession of the rings. She claims that Debtor has the rings based on a pick-up slip from the jeweler dated February 2, 2019. *See* Exhibit 11.1. Debtor testified that, after he picked up the rings from the jewelry store, he met Ms. Valencia at a freeway exit between Albuquerque and Grants, and gave her the rings after she threatened not to allow him to see her children if he refused to give her the rings. The Court finds Debtor's testimony more credible on this issue and finds that Debtor gave the rings to Ms. Valencia at the freeway exit.

*Wall Material*

Ms. Valencia claims Debtor owes her $363.00 for wall material purchased for Debtor's home. Exhibit 12.3, which identifies this expense on a typed sheet Ms. Valencia prepared, was not admitted into evidence. Ms. Valencia has not proven by a preponderance of the evidence that Debtor agreed to reimburse her for the wall material debt.

*Loans for Personal Bills*

While Ms. Valencia and Debtor lived together, Ms. Valencia would loan Debtor cash or make a payment on his behalf when Debtor was waiting for payment from his customers for construction jobs. Ms. Valencia routinely kept scrap papers documenting the amounts she paid on Debtor's behalf to keep track of the amounts Debtor owed to her. *See* Exhibit 2. Once Debtor repaid Ms. Valencia, they would toss the paper away. Most of the handwriting on Exhibit 2 is Ms. Valencia's, but one line item for $163.47 is Debtor's handwriting. *Id.* The document shows an ending balance of $938.41. *Id.* The Court does not find Ms. Valencia's testimony sufficiently credible or the other evidence sufficiently persuasive to make any finding regarding the amount, if any, Debtor owes Ms. Valencia to reimburse her for the personal loans.

-9-

*Settlement of Dispute with Ms. Medina*

In 2018, Debtor agreed to do electrical construction work for Bonnie Medina. Debtor and Ms. Valencia knew Ms. Medina because Ms. Medina worked with Ms. Valencia's mother at Wal-Mart. Ms. Medina gave Debtor $7,500 as a deposit for the work. He dropped off some supplies at Ms. Medina's home but did not start or complete the work. Ms. Medina was not pleased. She complained about Debtor to the Regulation and Licensing Department of the New Mexico Construction Industries Division. Ms. Medina also went to Ms. Valencia's work and demanded the return of her deposit. Debtor could not return the deposit to Ms. Medina immediately because the money had already been spent. Debtor testified that Ms. Medina bothered Ms. Valencia and her mother more than Ms. Medina bothered him, and that he was willing to let Ms. Medina sue him. Ultimately, Ms. Medina's continued harassment of Ms. Valencia and her parents became so unbearable that Ms. Valencia suggested Debtor file a complaint against Ms. Medina to obtain a restraining order. Ms. Valencia helped Debtor fill out the Civil Complaint and Complaint for Civil Injunction against Ms. Medina filed in state court on May 23, 2018. *See* Exhibit D.

To settle the dispute with Ms. Medina, on May 24, 2018, Ms. Valencia obtained a loan from U.S. Bank National Association for $7,500, at 9.98% interest, payable in monthly installments of $191.36 for 48 months (the "Loan"). *See* Exhibit 6. Debtor paid Ms. Medina $7,500.00 using the Loan proceeds as the source of payment. Ms. Valencia testified that she took out the Loan in her name because her credit was better than Debtor's. Debtor testified that he did not ask Ms. Valencia to obtain the Loan and was willing to let Ms. Medina sue him. The Loan from U.S. Bank was a four-year loan at 9.98% interest with monthly payments of $191.36. *See* Exhibit 6. Debtor made seven monthly payments on the Loan from June through

-10-

December 2018. Ms. Valencia's uncontroverted testimony is that the balance she owes on the Loan is $5,798.64. The Court finds that Debtor and Ms. Valencia reached an oral agreement under which Debtor agreed to pay Ms. Valencia back in the amount of the Loan.

DISCUSSION

A. <u>Procedural Requirements</u>

Federal Rule of Bankruptcy Procedure 3001 sets out the procedural requirements for filing a proof of claim. A claimant must file a proof of claim on the Official Form. Fed.R.Bankr.P. 3001(a). The creditor, or the creditor's authorized agent, must sign the proof of claim. Fed.R.Bankr.P. 3001(b). Under Fed.R.Bankr.P. 3001(c)(1), if the claim is based on a writing, the claimant must include a copy of the writing with the proof of claim.[8] If the claim includes pre-petition interest, fees, expenses or other charges, the proof of claim must also include an itemized statement of those amounts. Fed.R.Bankr.P. 3001(c)(2)(A). Subsection (c)(2)(D) provides:

> If the holder of a claim fails to provide any information required . . . [by the rule], the court may, after notice and a hearing, take either or both of the following actions:
> (i) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or
> (ii) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

Fed.R.Bankr.P. 3001(c)(2)(D).

---

[8] Fed.R.Bankr.P. 3001(c)(1) provides:
> Except for a claim governed by paragraph (3) of this subdivision, when a claim, or an interest in property of the debtor securing the claim, is based on a writing, a copy of the writing shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.
Fed.R.Bankr.P. 3001(c)(1). Subsection (3) governs open-end or revolving consumer credit agreements and is not applicable to Ms. Valencia's claim.

Ms. Valencia filed her Proof of Claim on Official Form 410, asserting a nonpriority unsecured claim against Debtor for $32,327.92.[9] She attached an itemized summary of the items she asserts form the basis of her claim, together with copies of various receipts, checks, invoices, the notarized Statement, and credit card account statements.

Having reviewed the Proof of Claim and the attached documentation, the Court concludes that the Proof of Claim was properly filed in accordance with Fed.R.Bankr.P. 3001. An unsecured claim may arise from an oral contract, in which case, there would not be a document that forms the basis of the claim. Further, "if the unsecured claim is not based on a writing, no documentation is required to achieve *prima facie* status." *In re Cluff*, 313 B.R. 323, 332 (Bankr. D. Utah 2004), *aff'd sub nom. Cluff v. eCast Settlement*, No. 2:04-CV-978 TS, 2006 WL 2820005 (D. Utah Sept. 29, 2006.). "[T]he phrase 'based on a writing' should be interpreted to include the fundamental part that creates a legal obligation and that is evidenced by any expressive format, set down by hand or typewriting, mechanical or electronic transmissions." *Id.* at 334. A claimant need not attach to a proof of claim all documentation that might ultimately be required to establish the amount of the claimant's allowed claim. *See In re Cleveland*, 396 B.R. 83, 97 (Bankr. N.D. Okla. 2008) ("The Rule was never meant to require that a creditor provide incontrovertible proof of its claim.").

---

[9] Ms. Valencia filed Claim No. 6 through the Court's electronic proof of claim system, known as ePOC. Submission of a proof of claim through ePOC serves as the submitting individual's signature on the document, and has the same force and effect as if the individual signed a paper copy of the document. *See* Electronic Proof of Claim Program ePOC instructions, www.nmb.uscourts.gov/claims-e-filing. Claim No. 8 was not submitted through ePOC and does not bear the claimant's signature. Neither Debtor nor the Trustee objected to Ms. Valencia's claim on grounds that Ms. Valencia failed to sign the Proof of Claim. Ms. Valencia withdrew Claim No. 6 in response to Debtor's and the Trustee's objection that the claim was duplicative and that Claim No. 8 showed greater detail. Under these circumstances, the Court concludes that Ms. Valencia's signature on Claim No. 6 establishes that Ms. Valencia complied with the signature requirements of Fed.R.Bankr.P. 3001(b).

Ms. Valencia attached documentation in support of her claim, even though much of her claim is based on the parties' course of dealing and Debtor's alleged oral commitment to repay Ms. Valencia for items she purchased on his behalf. The documentation she attached to her Proof of Claim serves "Bankruptcy Rule 3001's essential purpose of providing objecting parties with sufficient information to evaluate the nature of the claims." *In re Crutchfield*, 492 B.R. 60, 73 (Bankr. M.D. Ga. 2013) (quoting *In re Davis*, No. 09-42685, 2011 WL 1302222, at *10 (Bankr. E.D. Tex. Mar. 31, 2011)). *See also Cleveland*, 396 B.R. at 97 (Rule 3001 expedites the claims adjudication process "by providing certain minimum evidentiary standards by which proofs of claim may be assessed.") (citing *Cluff*, 313 B.R. at 332). Because Ms. Valencia's Proof of Claim complies with the procedural requirements of Fed.R.Bankr.P. 3001, it constitutes prima facie evidence of the validity and amount of her claim. Fed.R.Bankr.P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").

At closing argument, the chapter 7 Trustee requested an award of attorneys' fees under Fed.R.Bankr.P. 3001(c)(2)(D)(ii). The Objection to Claim did not include a request for attorneys' fees, and the Trustee citied no other basis for an award of attorneys' fees. Because the Court concludes that the Proof of Claim meets the procedural requirements of Fed.R.Bankr.P. 3001, and the Trustee did not request an award of attorney's fees in his objection, the Court will deny the Trustee's request for attorneys' fees.

B. Applicable Burden of Proof

The burden of proof in a claim objection contested matter is a shifting one. Because a proof of claim properly filed in accordance with Fed.R.Bankr.P. 3001 is entitled to the evidentiary presumption of the validity and amount of the claim, "[t]he objecting party has the

burden of going forward with evidence supporting the objection." *In re Geneva Steel Co.*, 260 B.R. 517, 524 (10th Cir. BAP 2001) (citation omitted), *aff'd,* 281 F.3d 1173 (10th Cir. 2002). "Such evidence must be of probative force equal to that of the allegations contained in the proof of claim." *Id.* "If the objecting party produces facts sufficient to demonstrate that an actual dispute regarding the claim's validity or amount exists, the burden of proof shifts to the claimant to prove in what amount its claim should be allowed." *In re Penaran*. 424 B.R. 868, 875 (Bankr. D. Kan. 2010) (citations omitted). In other words, "[o]nce the objecting party has reached this threshold, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim." *Geneva Steel,* 260 B.R. at 524 (citing *In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993). The Court determines the amount of the allowed claim, if any, as of the petition date. 11 U.S.C. § 502(a).[10] With these standards in mind, the Court will evaluate the evidence.

C. <u>The Evidence and the Amount of the Allowed Claim</u>

Both parties urge the Court to discount the testimony of the opposing party based on credibility concerns. In general, Debtor contends that he does not owe Ms. Valencia because of the way the parties handled their joint finances. The Court has determined, despite's Debtor's denial, that Debtor signed a notarized Statement (Exhibit 1) acknowledging that he would repay Ms. Valencia for debts she incurred to Discount Tire, Home Depot, and Helzberg. However, the Statement fails to establish the amount of any debts. The only other written acknowledgment that Debtor owes Ms. Valencia for a debt is the hand-written tally, primarily in Ms. Valencia's handwriting. *See* Exhibit 2. Debtor denies that he initialed that document. Overall, there is a lack of corroborating documentary evidence to establish the amount of Ms. Valencia's claim.

---

[10] All future statutory references are to Title 11 of the United States Code.

Except for the Discount Tire and Medina debt, the Court has concluded that Ms. Valencia has not met her burden of proof either to show Debtor is indebted to her or has not proven in what amount. The Court will review each component of Ms. Valencia's to explain how it reached this conclusion.

### 1. *Discount Tire*

Ms. Valencia claims Debtor agreed to pay her for a debt to Discount Tire and that he owes her the unpaid balance of that debt in the amount of $826.75. Ms. Valencia's claim for $826.75 is entitled to the evidentiary presumption of validity and amount based on inclusion of the claim in Ms. Valencia's Poof of Claim with the required documentary support attached. *See* Claim 8-1. Debtor's agreement to pay Ms. Valencia for the Discount Tire debt in the Statement (Exhibit 1) is attached to the Proof of Claim. Also attached to the Proof of Claim are two account statements and an Account Details summary from Discount Tire that support the claim amount.[11] Ms. Valencia is entitled to the evidentiary presumption of the validity and amount of the claim arising from her filing the Proof of Claim even though the account statements and Account Details summary were not admitted in evidence at the final hearing,

Neither the Debtor nor the Trustee has offered sufficient probative evidence to show that there is a genuine dispute as to the validity or the amount of the claim attributable to the Discount Tire debt. Ms. Valencia is entitled to an allowed nonpriority unsecured claim for the balance of the debt to Discount Tire in the amount of $826.75.

---

[11] One account statement with a closing date of March 31, 2019 shows a balance of $826.75. See Claim 8-1, p. 9. This amount is consistent with the itemized summary attached to her Proof of Claim. See Claim 8-1, p. 4. The other account statement shows a balance of $780.45 and appears to be a statement from the previous month, though the closing date is not reflected in the account statement. See Claim 8-1, Part 2, p.1. Finally, the Account Details summary reflects a "Last Statement Balance" of $826.75, a current balance of $731.75, a payment of $55.90 on April 19, 2019, and a "next payment due date" of April 23, 2019. See Claim 8-1, p. 10.

## 2. *Home Depot*

In her Proof of Claim, Ms. Valencia claimed the entire of $10,995.00 balance owing on the Home Depot Card as reflected in the Home Depot Card account statement attached to the Proof of Claim. However, at the final hearing Ms. Valencia admitted that Home Depot gave her a credit of $4,000.00 against the $10,995.00 after concluding a fraud investigation. The credit was given before Ms. Valencia filed her Proof of Claim. The document attached to the Proof of Claim to support the $10,995.00 claim amount, therefore, was seriously misleading, and the claim amount was inflated. Ms. Valencia is not entitled to the evidentiary presumption as to the amount of her claim attributable to the Home Depot debt based on her Proof of Claim.

Ms. Valencia testified that the amount of the fraud credit was $4,000.00 but offered no supporting documentary evidence. Although Debtor acknowledged that he used the Home Depot Card, and acknowledged that he would repay Ms. Valencia for the debt to Home Depot, Debtor also testified that he did not use the Home Depot Card after 2018. The receipts offered in support of the debt on the Home Depot Card were useless because they could not be reconciled with the $10,995.00 balance as of April 20, 2019. *See* Exhibit 8.2. The Home Depot Card account statement itself was internally inconsistent in as much as it reported a $00.00 previous monthly balance at the same time that it reported that the account is past due. *Id.* The evidence Ms. Valencia offered in support of her claim based on the Home Depot debt fell well short of establishing that Debtor made charges on the Home Depot Card totaling $6,995.05 which he agreed to but did not pay Ms. Valencia. Because Ms. Valencia has not proven the amount of the debt on the Home Depot Card attributable to Debtor's charges that he did not pay her, she has failed to satisfy her burden of persuasion.

-16-

### 3. *Arnold's Carpets/Flooring*

Ms. Valencia claims that Debtor owes her $6,608.24 for flooring purchased from Arnold's Carpets that was installed in Debtor's home. There was no written agreement governing Debtor's obligations with respect to this debt. Debtor's written Statement (Exhibit 1) acknowledging he agreed to pay certain debts does not include the Arnold's Carpets debt.

Ms. Valencia and Debtor gave conflicting testimony regarding this debt. The new flooring was purchased when the couple believed they would be living together in Debtor's home into the indefinite future and while they were pooling income and sharing various expenses. The Court finds and concludes that Ms. Valencia has not proven by a preponderance of the evidence that Debtor agreed to pay her for the debt attributable to the flooring.

### 4. *Fencing*

Ms. Valencia claims Debtor owes her $1,325.00 that her parents paid Debtor to install a fence at Ms. Valencia's property which he never installed. Ms. Valencia testified that she repaid the $1,325.00 to her parents. Debtor testified that he used the $1,325.00 to rent a bobcat and a backhoe to clear the debris from and level property owned by Ms. Valencia. Ms. Valencia responded that Debtor agreed to clear the debris and level the property in exchange for payment of fuel for the bobcat and backhoe.

Ms. Valencia's testimony together with the documentary evidence establishes that Ms. Valencia's parents, through their company Arnold's Carpets, paid Debtor $1,325.00 to install the fence. Debtor admits he did not install the fence. However, no documentary evidence was proffered to support Ms. Valencia's testimony that she repaid the $1,325.00 to her parents. The Court finds and concludes that Ms. Valencia has not proven by a preponderance of the evidence

that Ms. Valencia repaid the $1,325.00 to her parents, or that her parents expected to be repaid, and therefore she has not established that Debtor owes her for the debt.[12]

### 5. *Car rental*

Ms. Valencia asserts a claim of $404.14 for a car rental expense. Ms. Valencia incurred the debt for the rental on her credit card. Ms. Valencia and Debtor gave conflicting testimony regarding whether Debtor agreed to reimburse Ms. Valencia for the debt. Each testified that the other insisted on renting a larger vehicle to attend Debtor's nephew's wedding in Phoenix. This is the type of debt that a married couple would incur together, regardless of whose credit card was charged for the debt. Although Ms. Valencia attached to her Proof of Claim a copy of a credit card account statement she asserts represents the balance due on the car rental, no documentary evidence of the amount of this debt was admitted at the final hearing. Ms. Valencia has not proven by a preponderance of the evidence that Debtor agreed to reimburse her for the rental car debt.

### 6. *Helzberg Diamonds*

Ms. Valencia asserts a claim of $2,496.24 for the Helzberg debt based in part on her Capital One Helzberg Diamond credit card account statements. Although Debtor acknowledged in the Statement that he would pay for Helzberg debt, the evidence is inclusive whether the balance due on Ms. Valencia's Helzberg credit card is included in the Helzberg debt listed in the Statement. Debtor testified that he paid for the original engagement ring in full. Ms. Valencia did not prove otherwise. If that is the debt referenced in the Statement, and if Debtor paid that debt in full, Debtor already discharged the Helzberg debt obligation he acknowledged in the Statement.

---

[12] Where Ms. Valencia and Debtor gave conflicting testimony with no documentary evidence to tip the scale on how to resolve the conflict, the Court reached its conclusions based in part on the Court's assessment of the credibly of the witnesses.

Moreover, the Court has found that Debtor returned possession of the engagement ring with the wedding bands attached to Ms. Valencia. Having received the benefit of an engagement ring that cost some $6,500.00, plus the additional wedding bands, Ms. Valencia should remain responsible for paying the remaining $2,496.24 amount owed.

### 7. *Wall Tile*

Ms. Valencia claims that Debtor owes her $363.00 for "wall material." The only written evidence of this debt is a typed sheet prepared by Ms. Valencia attached to her Proof of Claim. *See* Claim 8-1, p. 4. Ms. Ms. Valencia has not proven by a preponderance of the evidence that Debtor her owes her for this debt.

### 8. *Loans/Personal Bills*

Ms. Valencia kept a running tab of amounts Ms. Valencia paid on Debtor's behalf for which she expected reimbursement. Based on Exhibit 2, Ms. Valencia claims Debtor owes her $938.47 to reimburse her for such payments. Even though Exhibit 2 includes notations identifying what the amounts are for, insufficient evidence was presented to corroborate Ms. Valencia's testimony. Ms. Valencia has not proven by a preponderance of the evidence that Debtor her owes her a debt to reimburse her for these personal loans.

### 9. *Medina Settlement*

Ms. Valencia claims Debtor owes her $5,798.64 to reimburse her for funds she advanced to Debtor that he used to settle a dispute with Ms. Medina. Ms. Medina demanded that Debtor refund her $7,500.00 deposit after Debtor was unable to perform electrical work for which she gave him the deposit. Ms. Valencia claims she loaned Debtor $7,500.00 so he could refund the deposit, and that Debtor still owes her the $5,798.64 unpaid balance of the Loan. The parties dispute whether they agreed that Ms. Valencia would take out a Loan so Debtor could return the

Case 19-12905-j7    Doc 75    Filed 03/16/21    Entered 03/16/21 14:58:40 Page 19 of 22

deposit amount to Ms. Medina. Debtor claims that he did not ask Ms. Valencia to obtain the Loan, that Ms. Valencia benefited from the settlement of Ms. Medina's dispute, and that he did not agree to pay reimburse Ms. Valencia for the Loan. There was no written agreement between Ms. Valencia and Debtor relating to the $7,500.00.

"Where an oral contract is disputed, all relevant circumstances surrounding the agreement, including statements of the parties and written documents, may be shown to establish its terms." *Branding Iron Club v. Riggs*, 207 F.2d 720, 724 (10th Cir. 1953) (citations omitted). The surrounding facts and circumstances establish that Debtor and Ms. Valencia had an oral agreement that the $7,500.00 Ms. Valencia advanced to Debtor to refund Ms. Medina's deposit was a loan that Debtor would repay Ms. Valencia. [13]

Debtor was obligated to refund Ms. Medina's $7,500.00 because he took her money and then did not perform the work for which she gave him the deposit. Debtor could not return Ms. Medina's deposit without Ms. Valencia's financial assistance because the deposit money had already been spent. Although Debtor testified he would rather have Ms. Medina sue him than voluntarily return the deposit, Debtor chose to use the funds Mr. Valencia advanced him to repay his debt to Ms. Medina. Debtor made the payments on the Loan for several months. Although the parties' testimony was conflicting, these surrounding facts and circumstances sufficiently establish the parties' oral agreement for Debtor to repay Ms. Valencia for the $7,500.00 Loan.

The Loan Ms. Valencia obtained from US Bank provides for payments of $191.36 per month for forty-eight months beginning June 23, 2018. *See* Exhibit 6. Debtor made some of the

---

[13] The Trustee asserts that the only way Ms. Valencia could recover on this debt is through an unjust enrichment theory, and that Ms. Valencia cannot satisfy the elements necessary to sustain a claim for unjust enrichment. The Court need not address whether Ms. Valencia could recover under an unjust enrichment theory because the Court concludes that the parties had a valid oral agreement whereby Debtor agreed to repay Ms. Valencia for the Loan.

-20-

$191.36 monthly payments and then stopped paying. The Court finds that Ms. Valencia's testimony as to the $5,798.64 balance Debtor still owes Ms. Valencia on his obligation to repay the $7,500.00 to be credible. Debtor did not controvert the amount of the unpaid balance. He only controverted whether he owed it. Ms. Valencia has an allowed nonpriority unsecured claim of $5,798.64 representing the unpaid balance of the Loan.

*Offsets*

Finally, Debtor claims that any debt owed to Ms. Valencia should be offset by amounts Ms. Valencia took from the couple's bank account while they lived together. Debtor has not proven he is entitled to an offset. The evidence did not provide a sufficient picture of the couples' finances over their eight-year relationship to support the offset claim.

## CONCLUSION

The parties' testimony was often conflicting, and the supporting documentary evidence was incomplete. Neither party was entirely credible. Debtor and Ms. Valencia lived together for a long time, and co-mingled and managed their finances together like a typical married couple. The allowed amount of Ms. Valencia's claim is limited to the unpaid balance of the Loan and the debt to Discount Tire. Ms. Valencia failed to sustain her ultimate burden of persuasion as to the remainder of her claim.

The Court will enter a separate order consistent with this opinion.


ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: March 16, 2021

COPY TO:

Ronald E Holmes
Attorney for Debtor
Davis Miles McGuire Gardner, PLLC
320 Gold SW, Suite 1111
Albuquerque, NM 87102

Daniel A. White
Attorney for Chapter 7 Trustee
Askew & White, LLC
1122 Central Ave SW, Ste. 1
Albuquerque, NM 87102

Michael K Daniels
Attorney for Angela Valencia
PO Box 1640
Albuquerque, NM 87103-1640